# State of New York Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 28
In the Matter of Mental Hygiene
Legal Service, &c.,
   Appellant,
  v.
Kerry Delaney, &c. et al.,
   Respondents,
et al.,
   Respondent.

Shannon Stockwell, for appellant.
Laura Etlinger, for respondents Kerry Delaney, &c. et al.
Autistic Self Advocacy Network, et al., and The Arc New York, amici curiae.

MEMORANDUM:

The appeal should be dismissed without costs, upon the ground that the issues presented are moot.

- 1 -

The subject child, a 16-year-old with developmental disabilities, was admitted into the emergency room of respondent Champlain Valley Physicians Hospital (hospital) after an incident at school during which she became unmanageable.  When the hospital determined that the child did not require in-patient psychiatric or medical care and sought to discharge the child, her mother declined to take her home based on concerns for the safety of the child's sibling.  The child's school district sought to remedy the situation by placing the child in a residential school, but no such school could accommodate her at that time.  Respondent New York State Office for People with Developmental Disabilities (OPWDD)—which facilitates the provision of various services to children with developmental disabilities pursuant to a Medicaid waiver program—tried to find the child a temporary, residential placement at a suitable facility, but none had appropriate accommodations for children.  OPWDD then increased the funds allocated to the child, who had previously been determined eligible to receive in-home services under the Medicaid waiver program, so that her mother could hire additional in-home services, but no qualified local providers were immediately available.  During the several weeks that a placement or provider for in-home services was sought, the child remained in the emergency room.

Petitioner Mental Hygiene Legal Services, on behalf of the child, commenced this combined CPLR articles 70 and 78 special proceeding and declaratory judgment action against the hospital, OPWDD, and respondent New York State Department of Health (DOH).  Specifically, petitioner sought the child's immediate discharge from the

emergency room; a "safe discharge plan upon her release;" a determination that "it is arbitrary and capricious for OPWDD and DOH to fail to provide community habilitation and respite services" to the child; a declaration that the child's "confinement in a segregated, isolated emergency room" violated her statutory rights; to enjoin respondents from "segregat[ing]" the child in the emergency room and to require that the child be afforded community habilitation and respite services "with reasonable promptness" under the Medicaid Act to "enable her to be discharged from the emergency room;" and to seal the records of this proceeding. In essence, the petition alleged that OPWDD's service model and programs for children were inadequate.

At a scheduled hearing on the matter, the parties advised Supreme Court that the child had been discharged from the emergency room to a suitable placement at a residential school. Petitioner declined Supreme Court's offer to adjourn the matter until longer-term placement was secured. Instead, petitioner sought entry of a final order dismissing the proceeding, indicating a desire to appeal expeditiously from the court's ruling.

During the pendency of petitioner's appeal to the Appellate Division, the child was unconditionally placed in the residential school.

On appeal, petitioner did not dispute that habeas relief was no longer available, nor did it seek to challenge the adequacy of the subject child's ultimate discharge or placement—the primary relief sought in the petition. The Appellate Division affirmed, determining that the matter was moot but applying the exception to the mootness doctrine

to reach petitioner's arguments (176 AD3d 24, 30-31 [3d Dept 2019]), which it rejected on the merits (*id.* at 31-37).

Petitioner does not contest that the matter is moot.  Nevertheless, petitioner urges this Court to apply the exception to the mootness doctrine, as the Appellate Division did below, to reach the merits of its challenges to respondents' compliance with or implementation of various statutes relating to the provision of services to children with disabilities.  However, it is undisputed that, during the pendency of petitioner's appeal to this Court, OPWDD developed a new program, Crisis Services for Individuals with Intellectual and/or Developmental Disabilities ([CSIDD] 14 NYCRR 635-16.1 *et seq.*), aimed at preventing persons with developmental disabilities from experiencing a crisis that may result in hospitalization and thereby reducing the likelihood of these issues recurring. At oral argument before this Court, counsel for OPWDD and DOH represented that the services provided by CSIDD are now available throughout the entirety of the State of New York, and particularly in the region where the child resided.  Given the intervening material alterations of the service programs challenged in the petition, we decline to invoke the exception to the mootness doctrine under the unique circumstances of this case (*see generally Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]).  Because we dismiss on mootness grounds, we have no occasion to address the substance of the Appellate Division's order.  Of course, should unfortunate extended hospitalizations give rise to new litigation, we take no position on any future challenges to the efficacy of OPWDD's current programs.

RIVERA, J. (dissenting):

Petitioner is a child with complex developmental disabilities who alleges that she was confined for weeks to an emergency room bed in a local general hospital because respondents approved, but failed to provide, necessary community habilitation and respite

services, as required by state and federal law.[1] These allegations are reminiscent of claims from the litigation of the 1970s when disabled people were institutionalized in settings that failed to meet their basic needs. Petitioner's counsel, Mental Hygiene Legal Service (MHLS), and the hospital where she was confined maintain that this was not an aberration, and that other similarly situated disabled children have languished in emergency rooms awaiting services. The courts below agreed with respondents that, although the child was confined to the emergency room during a lengthy waiting period for services approved by the State, the child cannot maintain a claim for relief under law. That cannot be true where petitioner challenges a gap in service resulting from the State's dependence on nonexistent service providers in her region, which in turn caused her lengthy confinement, notwithstanding that both state and federal law expressly require the State to ensure necessary medical services to all eligible persons with developmental disabilities in order to effectuate the legislative goal of minimizing the risk of institutionalization. Her assertions are sufficient at the pleading stage. Therefore, I would reverse and remit so that the lower court may consider whether the State's delayed process for ensuring the provision of services is legally permissible.

I.

Background

---

[1] Mental Hygiene Legal Services and the Attorney General refer to the child as "petitioner" and I do the same to maintain confidentiality and uniformity of the anonymized reference throughout this writing.

To understand what led to the governmental actions challenged on this appeal requires some historical background on discrimination against persons with disabilities, especially those with developmental disabilities, the social movement and litigation to end institutionalization and segregation in state-run facilities, and legislation to protect the civil rights of the disabled and to fund appropriate services that further the goal of integration in community settings.

A.

The Movement from Institutionalization to Deinstitutionalization and Community Integration

For decades throughout the United States, many thousands of people with intellectual and developmental disabilities were segregated from their communities in massive state-run institutions, more akin to warehouses, where they often suffered physical and mental abuse, neglect, and isolation from friends, family, and the broader society. In many instances, the "treatment" afforded to individuals in these institutions "was merely custodial, more concerned with achieving quiescence and control than in promoting recovery" (*see* Samuel R. Bagenstos, *The Past and Future of Deinstitutionalization Litigation*, 34 Cardozo L Rev 1, 24 [2012]). The number of people with such disabilities confined to state-run institutions in the United States peaked at 194,650 in 1967 (*see id.* at 7-8 [2012], citing Deborah S. Metzel, *Historical Social Geography*, in Mental Retardation in America: A Historical Reader 420, 432 [Steven Noll & James W. Trent Jr. eds., 2004]).

In response to the humanitarian crisis in these institutions, disability rights supporters pushed for deinstitutionalization. Advocates sought to move individuals with disabilities out of state-run institutions through litigation and to ensure that such individuals could receive services and resources necessary to thrive outside of an institutional setting (*see id.* at 16, citing Jennifer L. Erkulwater, Disability Rights and the American Social Safety Net 54 [2006] ["(R)eformers sought as a final goal to replace the asylum with a community-based system of mental health care, a policy that would allow people with mental disorders to live in their home neighborhoods and to enjoy all the rights and social privileges offered to the able-bodied"]).

In New York, a turning point for the deinstitutionalization movement occurred in 1972, with breaking news of the inhumane conditions at Willowbrook State School, where thousands of disabled children and adults resided. Millions watched the news coverage and were horrified by the images (*see* John J. O'Connor, *TV: Willowbrook State School, 'the Big Town's Leper Colony'*, NY Times, Feb. 2, 1972, 78, available at https://timesmachine.nytimes.com/timesmachine/1972/02/02/79417203.html). According to reports, residents were found naked or barely clad, strapped to beds and chairs, left in squalor in filthy ward rooms (*see e.g. id.*; *see also* Benjamin Weiser, *Beatings, Burns and Betrayal: The Willowbrook Scandal's Legacy*, NY Times, Feb. 21, 2020, available at https://www.nytimes.com/2020/02/21/nyregion/willowbrook-state-school-staten-island.html). Residents were often left huddled in these rooms, aimless and anxious, receiving no treatment or educational services. Investigations also revealed that adults and

children were often beaten by the employees (*see* Eyewitness News, *Revisiting Willowbrook 50 years Later With Reporter Geraldo Rivera* [Apr. 1, 2022], https://abc7ny.com/willowbrook-geraldo-rivera-staten-island-bill-ritter/11575075/ [last accessed Apr. 5, 2022]). These conditions had long existed. Almost a decade before the images of Willowbrook revealed to the general public the harsh reality of institutionalization in America, Senator Robert Kennedy visited the facility in 1964 and declared that it "borders on a snake pit" (*see* Weiser).

In 1973, with those images still fresh in the public mind, one of the most significant legal challenges to institutionalization took place, when parents of nearly 5,000 residents of Willowbrook filed suit in federal court. The court found multiple failures by the facility to protect the physical safety of the disabled children residing there, determined that its condition was deteriorating rather than improving, and deemed the institution "hazardous to the health, safety, and sanity of the residents" (*New York State Assn. for Retarded Children v Rockefeller*, 357 F Supp 752, 755-756 [ED NY 1973]). Eventually, the court entered a consent judgment, which established guidelines and certain minimum requirements for the institution (*see id.* at 768-770). Although Willowbrook closed its doors in 1987, problems persist decades later, as reported in a 2020 New York Times article (*see* Weiser [noting that "(m)any of the institution's 2,300 alumni who are alive today still suffer from mistreatment," including, in 2019 alone, "97 reported allegations of physical abuse by group home workers against Willowbrook alumni" and "34 allegations of

psychological abuse and hundreds more of neglect and other mistreatment, like improper use of restraints or seclusion, medication errors and theft"]).

The momentum for change continued to build through the 1970s, leading to legislative and executive action. The enactment of the Supplemental Security Income program in 1972, which used federal funds to provide cash benefits to people with mental and developmental disabilities living in the community, further allowed states to reduce costs by closing their facilities (42 USC § 1381 *et seq.*). A 1974 Executive Order set forth the national goal of returning about one-third of the nearly 200,000 people with developmental disabilities in public institutions to community residential placements (*see* Executive Order 11,776 [Nixon] [39 Fed Reg 11865] [1974]). The order also directed the Justice Department to strengthen the full legal rights of people with mental disabilities (*see id.*; *see also* Breita Linnell & Colleen Wieck, *Access to Justice: The Impact of Federal Courts on Disability Rights*, 59 Fed Law 48, 51 [2012]).

The introduction of Medicaid spurred a shift in funding for people with such disabilities in state hospitals "from the states' responsibility to a shared partnership with the federal government" (*see* Daniel Yohanna, *Deinstitutionalization of People with Mental Illness: Causes and Consequences*, 15 Virtual Mentor 886, 888 [2013]). In 1981, Congress enacted section 1915 (c) of the Social Security Act, which authorized the Medicaid Home and Community Based Services (HCBS) waiver program (*see* 42 CFR § 441.300; 42 USC § 1396n [c]). The HCBS waiver "was designed to provide non-institutional, community-based services to Medicaid eligible individuals who were either

older or disabled and who, in the absence of the alternative services, would remain susceptible to being placed in [an institution] or other Medicaid sponsored facility" (Jonathan G. Lerner & David Pollack, *Where Have All the Developmental Centers Gone? The Federal Push for Community-Based Services for People with Intellectual and Developmental Disabilities*, 43 Cap U L Rev 751, 755 [2015]). As is obvious, the HCBS waiver program is intended to ensure that people with developmental disabilities are not unnecessarily institutionalized or segregated (*see* 42 USC § 1396n [c] [1]).

The passage of the Americans with Disabilities Act (ADA) in 1990 marked another success of the deinstitutionalization movement. The ADA is a civil rights act for disabled persons, structured similarly to the Civil Rights Act of 1964, and prohibits discrimination on account of disability. After its passage, advocates began to challenge institutionalization under the ADA, on the theory that large institutions for individuals with mental and developmental disabilities were discriminating against their residents (*see* Bagenstos at 29). This approach gained full recognition following the United States Supreme Court's decision in *Olmstead v L.C.* (527 US 581 [1999]). There, the Court held that unjustified institutionalization could violate the ADA by segregating individuals with disabilities from their communities (*see id.* at 587). Specifically, the Court held that the ADA requires a state to move an individual from an institution to a more integrated setting when: (1) state treatment professionals have found that community placement is appropriate for the individual; (2) the move to a less segregated placement is "not opposed by the affected individual"; and (3) "the placement can be reasonably accommodated,

taking into account the resources available to the State and the needs of others with mental disabilities" (*id.*).

B.

Institutionalization, Deinstitutionalization, and Integration of Developmentally Disabled Individuals in New York

As the *Willowbrook* litigation made clear, New York State was not exempt from the shameful history of institutionalization. Fortunately, since the peak of institutionalization, the State has made efforts to promote the integration of individuals with mental and developmental disabilities into their community. For instance, the Office of People with Developmental Disabilities (OPWDD), part of the State Department of Mental Health, was created in 1978 with the aim of implementing the *Willowbrook* consent decree and the resulting process of deinstitutionalization (*see* OPWDD, *About Us*, https://opwdd.ny.gov/about-us). Nonetheless, advocates maintain that these efforts have failed to end the mistreatment of the developmentally disabled, especially children. For example, more than a decade after the passage of the ADA, "thousands of mentally ill children and teenagers" were, like petitioner, "trapped" in hospitals because of a lack of community-based services and treatment options (Carey Goldberg, *Children Trapped by Mental Illness*, NY Times, July 9, 2001, 1, available at https://www.nytimes.com/2001/07/09/us/children-trapped-by-mental-illness.html). That appalling situation has persisted and has, for instance, resulted in New York having some of the longest hospital stays for young people with autism in the country (*see* Christina

Jewett, *Nowhere to Go: Young People with Autism Languish in Hospitals*, Kaiser Health News [Sept. 26, 2017], https://khn.org/news/for-thousands-of-autistic-teens-hospital-ers-serve-as-home/). Indeed, the president of the Autism Society of America has referred to the prolonged hospital stays facing children with severe mental and developmental disabilities as a new form of "warehousing" (*id.*). All too frequently, the large institutions of decades past have merely been replaced by hospital emergency rooms.

State officials have long been aware of these problems and their obligations to address the unmet needs of persons with developmental disabilities. More than a decade ago, DOH's Behavioral Health Reform Work Group recognized that, "[d]espite the significant spending on behavioral health care, the system offers little comprehensive care coordination even to the highest-need individuals, and there is little accountability for the provision of quality care and for improved outcomes for patients" (NY State DOH, Medical Redesign Team (MRT) Behavioral Health Reform Work Group, *Final Recommendations*, at 3 [Oct. 15, 2011], https://www.health.ny.gov/health_care/medicaid/redesign/behavioral_health/docs/mrt_behavioral_health_reform_recommend.pdf; *see also id.* at 16 ["Families are often served by a disjointed, overlapping, non- comprehensive and costly series of services"]). Two years later, New York State's *Report and Recommendations of the Olmstead Cabinet* similarly "[r]ecogniz[ed] the need to build additional community capacity to support people with developmental disabilities and their families in the community" (Olmstead Cabinet, *Report and Recommendations of the Olmstead Cabinet: A Comprehensive Plan for Serving People*

*with Disabilities in the Most Integrated Setting* at 11 [Oct. 2013], https://www.criminaljustice.ny.gov/opca/pdfs/9-Olmstead-Cabinet-Report101013.pdf; *see generally*, New York State, *Olmstead: Community Integration for Every New Yorker*, https://www.ny.gov/programs/olmstead-community-integration-every-new-yorker). In the face of these well recognized problems, New York's legislature established the Most Integrated Setting Coordinating Council, tasked with overseeing the work of the report so that disabled persons receive care and services in the most integrated settings appropriate to their individual needs (*see* Exec Law § 700 ["(T)he legislature hereby finds that it is incumbent upon New York state to develop and implement a plan to reasonably accommodate the desire of people of all ages with disabilities to avoid institutionalization and be appropriately placed in the most integrated setting possible"]). The problems nonetheless persist because of the fragmentation of service delivery. As aptly described in the United Hospital Fund's report, "responsibility for children's [behavioral health] services is divided among an array of State and county agencies and the care itself is provided across many different settings. Children enter through multiple doors and receive treatment and interventions in various systems with little coordination among them. Although the State offers many robust and specialized services designed for the neediest children, the actual delivery of those services is piecemeal and fragmented" (*see* Elizabeth Patchias, Medicaid Inst. at United Hosp. Fund, *Redesigning Children's Behavioral Health Services in New York's Medicaid Program* at 1 [Nov. 2015], https://uhfnyc.org/media/filer_public/8e/47/8e478b62-ad6e-4b96-828e-7719e0228b17/childrens-bh-final-1110151.pdf]). This inadequate delivery system places

children at risk because "complex eligibility pathways for waiver services[] can lead to uncoordinated and fragmented care, as well as . . . long waits for services such as day treatment and residential treatment facilities. Furthermore, this design and its resulting fragmented service array is insufficiently flexible to meet many children's constantly changing (behavioral health) needs, complicating the goal of connecting kids to the right services in the right amount at the right time" (*id.* at 5).

Obviously, it is not a question of knowing what is wrong but of doing something about it.

C.

Current OPWDD Programs

OPWDD no longer operates residential facilities for children with developmental disabilities, as it still does for adults aged 21 and over.[2] Instead, OPWDD has adopted a service delivery model for children that is solely dependent on not-for-profit service providers. For children who require services in a residence outside their homes, OPWDD authorizes services through a third-party provider, coordinating with OPWDD regional operating offices in specific geographic regions (*see* MHL § 13.17 [b]). In accordance with this service model, OPWDD works with individuals and families to identify appropriate providers in their region. In other words, OPWDD serves as a coordinator and referral

---

[2] According to respondents, the movement for least restrictive settings and community integration led the State to close large government-run facilities. Now, the State operates and certifies community-based residential programs in small facilities.

service, at times providing crisis management (*see id.* § 13.15 [a]-[b]; *id.* § 13.17 [c]; 14 NYCRR § 619.2; 14 NYCRR § 635-16.1 *et seq.*). However, a child's family or representative is ultimately responsible for finding a provider. That task can be a challenge, partly because providers are not legally compelled to accept any particular child, and partly because, as respondents concede, in some regions (including where petitioner lives), there is a scarcity of these services for children. As a consequence, some children are forced to wait until a provider is eventually located. At times, when an appropriate residential placement is unavailable, they remain confined in hospital emergency rooms; all the while, they are segregated from the community and unable to access the medical services to which they are entitled. Advocates have complained about this gap in services and noted how, during this period of confinement, children are at risk of further deterioration of their mental and emotional conditions.

It is in the context of this reality that petitioner filed this action seeking judicial review of the State's alleged violations of her rights as a child with developmental disabilities to approved Medicaid services.

## II.

## Facts and Procedural History

The majority summarizes the undisputed facts, and here I add or emphasize the facts necessary to clarify the grounds for the allegations against the State respondents and the merits of those claims.

Petitioner sought injunctive and declaratory relief from the respective State commissioners of the OPWDD and the Department of Health (DOH) based on her status as a Medicaid recipient and a child with complex developmental disabilities eligible for medical services. She alleged that respondents violated state and federal law by failing to assist and remedy her prolonged and medically unnecessary confinement in a general hospital emergency room. According to petitioner, although respondent OPWDD had approved community habilitation and respite services, which would have permitted her discharge, the State had yet to provide these services and so she languished in the emergency room, waiting for the State to find an available provider capable of addressing her needs.

She further asserted that habilitation services are legally defined as services designed to provide general assistance to persons, in accordance with their individualized service plan, to acquire and maintain those life skills that enable them to cope more effectively with their environments (14 NYCRR 635-10.4 [b] [l]). These services are directed toward acquiring, retaining, and improving the self-help, socialization and adaptive skills necessary to reside successfully in home and community-based settings (*id.* § 635.10 [b] [l]). Respite is the provision of intermittent, temporary, substitute care of a person with developmental disabilities on behalf of a primary care giver. It is a means of providing relief from the responsibilities of daily caregiving (*id.* § 686.99 [ag]).

Petitioner also alleged that "neither OPWDD nor any agency licensed by OPWDD has indicated that it can offer to provide plaintiff with residential respite services" and that

petitioner's attending physicians and other treatment providers at the hospital "are of the opinion that continuing to hold plaintiff[] in the hospital is inappropriate and detrimental to her health and welfare." Petitioner explained that, during her confinement in the emergency room, she could not attend school and was "isolated from community integration opportunities." More broadly, she alleged that there are systemic deficiencies on the part of OPWDD, which has failed to budget and plan to meet the needs of disabled children facing crisis situations, and that her case is illustrative of a larger, system-wide problem, wherein OPWDD is failing to meet the needs of similarly situated children with disabilities in crisis. Petitioner asserted, among others, causes of action under the Mental Hygiene Law, Medicaid Act, and the Americans with Disabilities Act and its implementing regulations.

Prior to the parties' first appearance in Supreme Court on the petition, the State respondents answered, admitting that the services petitioner would require—and which OPWDD has approved and will fund—are community rehabilitation and respite services, which are Medicaid-funded services. Respondents also admitted that no residential school had accepted petitioner for admission and eight had denied her application. Respondents submitted affidavits in opposition from an OPWDD and DOH official. The Deputy Director of petitioner's OPWDD regional office averred that OPWDD approved petitioner for respite and community habilitation services, that it provides these and other services to children with developmental disabilities generally through not-for-profit agencies, that the regional office sent a referral to all OPWDD regional offices to seek a temporary placement

for petitioner but no voluntary agency was able to accept her, and that outreach to OPWDD
State Operations for a temporary bed was similarly unsuccessful, as was a request to a local
nonprofit respite house.[3] As the Deputy Director explained, the State's model relies on
private providers to serve children with developmental disabilities, but most providers
serve adults and are not equipped to provide residential services to teenagers or children.
He admitted that "there is a dearth of providers" in petitioner's region, and that OPWDD
would "continue to assist the various stakeholders in finding an appropriate placement" for
petitioner, but he noted that OPWDD was "not the only agency involved" and
recommended that "[p]ossible Foster Care placements should be explored, as well as
educational and mental health settings." In her cursory submission, the Director of the
Division of Hospitals and Diagnostic and Treatment Centers of the State DOH averred that
DOH's obligation is to assure that hospitals provide appropriate care, safe discharge plans,
and follow up and continuing care and that, because petitioner had not been discharged,
DOH "does not currently have an obligation to assist in this matter."

The hospital where petitioner was confined submitted memorandum of law in
support, confirming petitioner's allegations that her case was not isolated. The hospital
asserted that before and after her prolonged stay in its emergency room, multiple other

---

[3] This provider submitted an amicus in support of petitioner, asserting that New York's
Mental Hygiene Law clearly requires the provision of services to individuals with complex
mental and developmental disabilities and that the State create an "effective, integrated,
comprehensive system for the delivery of all necessary supports and services to all
individuals with developmental disabilities and [] *create financing procedures and
mechanisms to support such . . . services*" (Br. of Amicus Curiae The Arc New York at 5,
quoting MHL § 13.01 [emphasis added]).

children found themselves similarly confined. Like petitioner, these children were in desperate need of residential placements, given their severe medical issues, but a lack of available space resulted in unconscionably prolonged stays. Multiple children, for instance, languished in the hospital's emergency room for over 100 days—during which time the children were confined to locked rooms, entirely segregated from their communities, including, in at least one case, the child's school.

After the petition was filed, petitioner was given a temporary residential placement on a trial basis. Upon its review of the matter, Supreme Court acknowledged the "stark reality that our state's most vulnerable children alarmingly spend multiple months (or longer) housed in hospital emergency rooms, notwithstanding the absence of any on-going medical need, nor abuse/neglect within the home setting nor the immense efforts of family members attempting to orchestrate a better life plan for their loved ones" (*see* 176 AD3d 24, 28 n 1 [3d Dept 2019], quoting Supreme Court's unpublished decision). Nevertheless, and although respondents did not file a motion to dismiss and no discovery was ordered, Supreme Court dismissed the petition, finding no legal grounds for relief.

During the pendency of petitioner's appeal, after the expiration of the trial period, the residential placement became permanent, ostensibly rendering the action moot (*id.* at 30 n 6). The Appellate Division invoked an exception to the mootness doctrine and addressed the merits of petitioner's claims (*see id.* at 37). The Appellate Division found that petitioner "is not the first minor with special needs to be marooned for weeks or months in an emergency room, as hospitals find themselves serving as the last resort for providing

shelter to children in crisis" (*id.* at 27-28). However, the Court ultimately affirmed the dismissal of the petition for lack of a legal remedy but clarified that its decision "should not be misunderstood as condonation of the child's prolonged and unnecessary hospitalization or of respondents' failure to provide her with appropriate assistance" (*id.* at 37). This Court granted petitioner leave to appeal (35 NY3d 912 [2020]).

I agree that no court should condone what is essentially the warehousing of children with disabilities, and certainly not because respondents' service model depends on admittedly scarce provider resources and underfunded budgets. Like the Appellate Division and unlike the majority, I conclude that the mootness exception applies. On the merits, petitioner has sufficiently stated several viable causes of action, and I would reverse and remand for further proceedings on those claims.

### III.

### Standard of Review

As a threshold matter, the question on appeal is whether petitioner has sufficiently alleged viable causes of action, not whether she will eventually prevail on her claims. The Appellate Division determined that respondents' failure to file a separate motion to dismiss meant that the applicable standard of review on appeal was *not* the facial sufficiency of petitioner's legal claims (*see id.* at 32 n 9). However, even if the Appellate Division purportedly "address[ed] the merits of petitioner's claims and d[id] not apply the standard for a motion to dismiss for failure to state a claim," it did so on a record devoid of any facts beyond those asserted in the pleadings (*id.*). Thus, when determining that dismissal was

warranted as a matter of law, the Court necessarily resolved a pure legal question to conclude that "the pleading fails to state a cause of action" (CPLR 3211 [7]). Given that analysis, the proper standard for evaluating the decision below turns on the facial sufficiency of the claims (*see Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). Under that standard, "the pleading is to be afforded a liberal construction . . . We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within *any cognizable legal theory*" (*id.* [emphasis added]).

## IV.

## Mootness

"As a general principle, courts are precluded 'from considering questions which, although once live, have become moot by passage of time or change in circumstances'" (*City of New York v Maul*, 14 NY3d 499, 507 [2010], quoting *Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714 [1980]). "Nevertheless, we have consistently applied an exception to the mootness doctrine, permitting judicial review, where the issues are substantial or novel, likely to recur and capable of evading review" (*Maul*, 14 NY3d at 507; *see also Chenier v Richard W.*, 82 NY2d 830, 832 [1993] [holding that an "appeal should be retained (when) it satisfies the three critical conditions to the mootness exception"]). Here, the issues raised are of substantial, statewide significance, involving alleged failures in respondents' provision of services for children with complex developmental disabilities, and these issues are likely to recur but evade appellate review

because placements may be found, as here, after extensive delay but before appellate resolution. The mootness exception was intended for just such a case as this.

I disagree with the majority that the mootness exception should not be applied here because of "intervening material alterations of the service programs challenged in the petition" (majority op at 4). In my view, respondents have failed to establish that these actions have closed the alleged service gap and eliminated lengthy hospital confinements, such that a decision on this appeal would have no real-world effect. Notably, respondents' mootness argument has consistently depended on judicial acceptance of their allegations that services are now seamlessly provided, even while they concede the shortage of resources within their existing service model.

Before the Appellate Division, OPWDD argued that it was establishing programs that could have assisted petitioner and children in comparable circumstances (*see* 176 AD3d at 34 n 11 ["OPWDD represents that it is establishing two new programs that could have assisted the child if they had been in effect then, and that these programs will help other children in comparable circumstances. These include NYSTART (New York Systemic, Therapeutic, Assessment, Resources and Treatment), which offers comprehensive resources to families of developmentally disabled children in crisis, and a transitional residential program that OPWDD has cofounded with the Office of Mental Health"]). In its briefing to this Court, respondents assert that the problems alleged by petitioner were not likely to recur because an additional program—the Crisis Services for Individuals with Intellectual and/or Developmental Disability (CSIDD)—now operates in

conjunction with the preexisting NYSTART program, which they define as a community-based crisis-intervention program. Respondents assert that CSIDD "will likely go a long way toward addressing the needs of children with complex development disabilities who face crisis situations that might otherwise require resident placements." Respondents further assert that 2017 statistics indicated that NYSTART significantly reduced emergency room visits and psychiatric hospital admissions, and that annual reports for April 2019 to March 2020 for two regions (neither of which were petitioner's service region), showed continued reductions in children's admissions to the emergency room. Respondents claim that the joint CSIDD/NYSTART program "assists individuals and their caregivers in responding effectively to signs of impending crises and thereby enables them to remain in their communities" and that it "has since proven that it too is highly successful in reducing children's hospitalizations." According to respondents, OPWDD "advises" that from April 1 to June 30, 2021, emergency room visits of CSIDD/NYSTART-served children have been "significantly reduced" in the regions where it operates, that emergency hospital visits have been reduced by half in these regions, and that "psychiatric admissions have also been greatly reduced for children enrolled in the program," with one region down to one percent.

These are promising statistics, but during the relevant time period, the prior NYSTART and the CSIDD/NYSTART joint program did not operate in petitioner's region and thus they provide no track record of success in support of a mootness dismissal, at least with respect to that region. Moreover, respondents have failed to contend with the

statement from the Deputy Director of petitioner's region that services for children like her are scarce.[4]

In any case, the State's representations to this Court are not firm assertions that timely service problems no longer exist but merely suggestions that things are improving, which respondents claim is demonstrated by a reduction in hospitalizations. First, accepting the accuracy of the statistics, almost all of these numbers represent hospitalizations during the COVID-19 pandemic, and it is not obvious that the reductions are solely due to the programs. Second, the CSIDD regulations recently became effective, in January 2021. Those regulations address the establishment and responsibilities of a crisis support team. Some of the CSIDD regulations requiring the assessment of individuals in crisis and the provision of services, however, allow an amount of time to act that exceeds petitioner's initial two-week period of confinement that was the motivation for commencing this challenge (*see e.g.* 14 NYCRR 635-16.5 [d] [5] ["The CSIDD treatment plan must be drafted as soon as possible within thirty (30) days of the individual's CSIDD referral"]; *id.* [c] [3] ["The individual must be assessed no less frequently than every three months"]). Although the regulations set forth the qualifications for providers of CSIDD, they do not guarantee the existence of actual providers within the community. Indeed, the State fails to identify a single provider under this program currently serving developmentally disabled

---

[4] Before granting leave, this Court inquired of the parties as to the effect of the new programs on the mootness of the case. As petitioner noted in her response, crisis-prevention programs would be of little use to children like petitioner, who have *already* experienced a crisis and are no longer in their home communities but are, instead, languishing in hospital emergency rooms.

children like petitioner in her region. And while respondents' November 8, 2021, submission to this Court states that OPWDD advised that it had tentatively awarded an application to provide services in Oliviah CC's region, it appears the application was not finally approved, as no provider for this region was mentioned at oral argument or listed on the OPWDD website (*see Crisis Services*, OPWDD, https://opwdd.ny.gov/contact-us [last accessed Apr. 4, 2022] [indicating "Region 2- CSIDD Provider in Development Phase"]). That is far from the type of change in status that might support dismissal of this action as moot.

The bottom line is: no service providers, no service. Such was the situation in existence when petitioner was taken to the hospital and was, in fact, why she was confined to the emergency room. The State's representations here are thus wholly insufficient to establish that the problems alleged in the petition have been resolved such that the issues challenged herein will not recur in the future. Without factual development, we cannot presume that these programs will fare any better than the referral program challenged in the petition—and they may create additional, as-yet-unidentified problems, as they are untested in a region with a severe shortage of providers and thus lack an established service protocol to build on. If these representations sufficed, then nothing more than unproven statements that the problem has been taken care of would be enough to render challenges moot and avoid judicial review of alleged statutory violations (*cf. W. Alabama Women's Ctr. v Williamson*, 900 F3d 1310, 1328 [11th Cir 2018] ["Mid-litigation assurances are all too easy to make and all too hard to enforce"]). We should be particularly cautious when

the claims involve allegations of prolonged delays in the provision of services that place the health and well-being of children in jeopardy.[5]

Respondents did not develop a record below of actual, successful changes to the aspects of the service model that allegedly resulted in the confinement of children with complex developmental disabilities to hospital emergency rooms; instead, they relied on legal arguments that petitioner was not entitled to relief as a matter of law. I would invoke the mootness exception and, as such, I now turn to the merits of petitioner's claims.

V.

State Mental Hygiene Law

Petitioner claims she has a statutory right to appropriate treatment under the Mental Hygiene Law. Specifically, the third and fourth causes of action allege, respectively, that OPWDD violated its duty to petitioner by failing to provide her with services she was entitled to under the MHL and that OPWDD and DOH's refusal to deliver certain

---

[5] Respondents alternatively assert that petitioner's situation is factually specific and unique and thus unlikely to recur. The majority does not dismiss on that ground and the Appellate Division rejected that argument. For its part, the majority's mootness analysis is predicated entirely on the promulgation of the CSIDD regulations during the pendency of the appeal (*see* majority op at 4), while the Appellate Division found all three criteria for the mootness exception satisfied here, even as it acknowledged the NYSTART program (176 AD3d at 30-31 & 34 n 11). On the merits, respondents' "uniqueness" claim is belied by the record, which includes references to other children with developmental disabilities who endured longer hospitalizations than petitioner, and OPWDD's admission that these confinements are a consequence of the lack of appropriate service providers.

Medicaid-funded services was arbitrary, capricious, and contrary to law.[6] The Appellate

Division treated these claims as a demand for relief in the nature of mandamus to compel

because petitioner did "not challenge any administrative determination by OPWDD, but

instead challenges its alleged omissions to act [and] [a]s such, mandamus to compel is

petitioner's 'sole available remedy'" (176 AD3d at 33, citing *New York Civ. Liberties*

*Union v State of New York*, 4 NY3d 175, 183-184 [2005]). The Appellate Division

concluded that mandamus was unavailable because the court had no power to intervene in

OPWDD's discretionary policy choice of how to deliver community habilitation and

respite services to disabled children (*see id.* at 34).

Petitioner claims that the Appellate Division misconstrued her causes of action,

which should be read as asserting that the MHL requires OPWDD and DOH to provide

services to individuals with developmental disabilities, like petitioner, and that respondents

recognized her right to those services but simply failed to provide them. Petitioner relies

on MHL § 33.03 (a), which states that "[e]ach patient in a facility and each person receiving

services for mental disability shall receive care and treatment that is suited to [their] needs

and skillfully, safely, and humanely administered with full respect for [their] dignity and

personal integrity." Petitioner also relies on MHL § 13.07 (c), which states that

> "[OPWDD] shall have the responsibility for seeing that
> persons with developmental disabilities . . . are provided with
> services including care and treatment, that such services are of
> high quality and effectiveness, and that the personal and civil
> rights of persons receiving such services are protected. The

---

[6] Petitioner abandoned her first cause of action for article 70 habeas relief and her second
cause of action alleging violations of DOH regulations.

> services provided shall seek to promote and attain independence, inclusion, individuality and productivity for persons with developmental disabilities."

Mandamus to compel "is an extraordinary remedy that is available only in limited circumstances" (*Alliance to End Chickens as Kaporos v New York City Police Dept.*, 32 NY3d 1091, 1093 [2018] [internal quotation and citations omitted]). A petitioner seeking mandamus to compel "must have a clear legal right to the relief demanded and there must exist a corresponding nondiscretionary duty on the part of the administrative agency to grant that relief" (*Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs.*, 77 NY2d 753, 757 [1991]). Additionally, mandamus "will not be awarded to compel an act in respect to which [a public] officer may exercise judgment or discretion" (*Alliance to End Chickens as Kaporos*, 32 NY3d at 1093 [internal quotations and citation omitted]). Specifically, a public official's act will be deemed discretionary—and thus, beyond the reach of an action seeking mandamus to compel—when it "involves the exercise of reasoned judgment which could typically produce different acceptable results" (*Tango v Tulevech*, 61 NY2d 34, 41 [1983]).

The third cause of action sought petitioner's immediate discharge to an appropriate community habilitation placement and respite services, as approved by OPWDD during her hospital confinement. That demand for relief is in the nature of mandamus to compel and was not available here, where OPWDD was exercising discretion in determining how to ensure she received the services.

Petitioner separately claims that her fourth cause of action properly alleged an article 78 claim that OPWDD's decision-making was arbitrary, capricious, and contrary to law. She is correct. Despite respondents' contention that arbitrary and capricious review is unavailable, petitioner's cause of action sought review of the State's failure to provide Medicaid services that were already in the State's approved plan and which OPWDD acknowledged petitioner was entitled to receive. In other words, petitioner alleged that respondents' failed attempts to ensure that those services were provided to her, in accordance with their existing service model—a process which resulted in a lengthy, unnecessary confinement in the emergency room—were arbitrary, capricious, and inconsistent with the MHL. That claim is not a request to compel a particular action but rather one for judicial pronouncement that the path taken by respondents fails to comply with state law.[7] If the court agreed with petitioner, respondents would have had an opportunity to develop a legally acceptable delivery model that avoids the lengthy confinements challenged here. Therefore, this cause of action should not have been dismissed.

## VI.

## Medicaid Act

---

[7] Respondents argue that petitioner did not expressly allege a private right of action under the MHL. The Appellate Division did not address this contention. Given the dismissal at the pleading stage and the underdevelopment of this argument, I would remit for consideration of that issue.

Petitioner asserted a cause of action under the federal Medicaid Act's "reasonable promptness" provision, based on her lengthy hospital confinement while she waited for State-approved Medicaid services. The Medicaid Act imposes various requirements on participating states, including that "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals" (42 USC § 1396a [a] [8]). The Appellate Division did not consider the merits of petitioner's claim because the Court concluded that this provision does not create a private right of action, relying in part on *Armstrong v Exceptional Child Center, Inc.* (575 US 320 [2015]).

The Medicaid Act does not contain an express private right of action, so the question is whether one may be implied. The statutory language and relevant caselaw support finding a private right of action for persons like petitioner, the individual statutory rightsholders and direct beneficiaries of Medicaid funds and services.[8]

In *Blessing v Freestone*, the United States Supreme Court set forth a three-factor test to determine whether a right of action may be implied:

> "First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the

---

[8] Petitioner alleged that she was a Medicaid recipient, and that assertion is not disputed by respondents.

provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms" (520 US 329, 340-341 [1997] [internal quotation marks and citations omitted]).

In *Blessing*, mothers of children who were eligible for state child support services under the federal Social Security Act sued the director of a state child support agency. They alleged that the state had not substantially complied with the federal law as a result of systemic defects in the state's child support services. These defects resulted in the failure of the agency to obtain the child support payments to which the plaintiffs' children were entitled, notwithstanding the mothers' compliance with statutory requirements and their good faith efforts to cooperate with the agency, thereby violating the mothers' rights under the statute. (*See id.* at 332-333). The Supreme Court concluded that the plaintiffs had not "identif[ied] with particularity the rights they claimed," noting that it was "impossible to determine whether [the federal law at issue], as an undifferentiated whole, gives rise to undefined 'rights'" (*id.* at 342). Furthermore, the relief the plaintiffs sought—that the state bring its agency into substantial compliance with the requirements of the federal law— evinced a misunderstanding of the purpose of those requirements, which were "not intended to benefit individual children and custodial parents" but rather served as a "yardstick" for the federal government to assess a state's compliance with its programs (*id.* at 343).

Thereafter, in *Gonzaga University v Doe,* the Court considered whether a student may sue a private university to enforce provisions of the federal Family Educational Rights and Privacy Act (FERPA) of 1974—enacted under Congress's spending power—which prohibits funding for any educational institutional that discloses information about a

student without the student's or their parents' consent (536 US 273, 276-278 [2002]). The Court concluded that FERPA's non-disclosure provisions "entirely lack the sort of rights-creating language critical to showing the requisite congressional intent to create new rights," specifically noting that, in contrast to the terminology of Titles VI and IX, FERPA's provisions are not "individually focused" but instead "speak only to the Secretary of Education" (*id.* at 287).

The Court also rejected the student's alternative argument that the statutory rights were enforceable by 42 USC § 1983, expressly rejecting the notion that some less rigorous standard—based on whether the statute confers a benefit rather than a right—applies to actions under section 1983. Finding some confusion in the lower courts which had adopted the view that *Blessing* permitted enforcement of a statute under section 1983 so long as the plaintiff is within the statute's zone of interest, the Court harmonized the test adopted in *Blessing* with its application to section 1983 claims.[9] The Court explained that section 1983 does not provide a free-standing claim. Instead, there must be a separate basis for a plaintiff's right of action:

> "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section. This being so, we further reject the notion that our implied right of action cases are separate and distinct from our

---

[9] The decision also ensures the legal analytic distinction between a plaintiff's individual "standing to sue" and a statutory right of action.

> § 1983 cases. To the contrary, our implied right of action cases
> should guide the determination of whether a statute confers
> rights enforceable under § 1983" (*id.* at 283).

As this analysis makes clear, the first *Blessing* factor requires a determination of whether the statutory language is intended to confer individual rights upon a class of beneficiaries (*see Waskul v Washtenaw County Community Mental Health*, 979 F3d 426, 447 [6th Cir 2020]).

Contrary to the Appellate Division's view, the analysis in *Armstrong* does not inexorably lead to the conclusion that no private right of action may be gleaned from the reasonable promptness provision's language. In *Armstrong*, the plaintiffs were providers of habilitation services to Medicaid-eligible individuals, who contended that the state agency responsible for administering the Medicaid plan violated section 1396a (a) (30) (A) of the Medicaid Act by reimbursing such providers at a lower rate than permitted under the statute. The *Armstrong* Court rejected the plaintiffs' theory that they had a private right of action to enforce that provision of the Medicaid Act, either under the Supremacy Clause or in equity. The Court noted that the providers did not assert that the Medicaid Act was a source for a cause of action, but nevertheless went on to state, in dicta, that section 1396a (a) (30) (A) "lacks the sort of rights-creating language needed to imply a private right of action" (*Armstrong*, 575 US at 331). Specifically, the provision was "phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid" (*id.*). Further weighing against a right of action by implication was the federal

government's authority to withhold funds as a penalty for statutory violations, and "the judicially unadministrable nature of the [provision]'s text" (*id.* at 328).

Here, petitioner—like all other Medicaid-eligible, developmentally disabled children approved for specific services—satisfies the first *Blessing* factor because she has a statutory right to those services as a direct beneficiary of the Medicaid program and the State's plans. She is thus distinguishable from the plaintiffs in *Armstrong*, whom the Court described as "mere incidental beneficiaries" and who were thus not the intended rightsholders under the Medicaid program (*id.* at 332). In contrast, the reasonable promptness provision is "focus[ed] on individual entitlements, requiring . . . that all eligible individuals['] assistance be furnished reasonably promptly . . . This is the kind of individually focused terminology that unambiguously confer[s] an individual entitlement under the law" (*Waskul*, 979 F3d at 447 [citation and quotation marks omitted]). Petitioner also satisfies the second factor because her right to reasonably prompt services is not "so "'vague and amorphous' that its enforcement would strain judicial competence" (*Blessing*, 520 US at 340-341, quoting *Wright v City of Roanoke Redevelopment and Hous. Auth.*, 479 US 418, 431-432 [1987]). The terms "reasonably" and "prompt" are well known to courts, and the judiciary is regularly called upon to consider whether actions are "reasonable" and if a party's failure to act has led to unacceptable delay causing harm (*see e.g. Virginian R. Co. v. Railway Employees*, 300 US 515, 550 [1937] ["(W)hether action taken or omitted is . . . reasonable, (is an) everyday subject() of inquiry by courts"]; *First Fin. Ins. Co. v Jetco Contr. Corp.*, 1 NY3d 64, 66 [2003] [determining that a 48-day delay

in notifying a policyholder of denial of coverage is unreasonable as a matter of law under Insurance Law § 3420 (d)]; *People v Wells*, 24 NY3d 971, 973 [2014] [determining whether a period of delay was reasonable for speedy trial purposes]).

As for the third factor, the provision's language is mandatory rather than precatory, as it uses the traditional terms of a command: "A State plan for medical assistance *must . . . provide that all individuals wishing to make application for medical assistance under the plan *shall* have opportunity to do so, and that such assistance *shall* be furnished with reasonable promptness to *all* eligible individuals" (42 USC § 1396a [a] [8] [emphases added]). Given such language, an implied right of action has in fact been recognized by several federal circuits (*see e.g. Waskul*, 979 F3d 426; *Romano v Greenstein*, 721 F3d 373 [5th Cir 2013]; *Doe v Kidd*, 501 F3d 348, 356-357 [4th Cir 2007], *holding reaffd in Doe v Kidd*, 419 Fed Appx 411 [4th Cir 2011]; *Sabree ex rel. Sabree v Richman*, 367 F3d 180 [3d Cir 2004]; *Bryson v Shumway*, 308 F3d 79 [1st Cir 2002]; *Doe ex rel. Doe v Chiles*, 136 F3d 709 [11th Cir 1998]).[10]

---

[10] Petitioner did not cite to section 1983, but, as the Supreme Court has held, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983" (*Gonzaga*, 536 US at 284). Thus, on remittal, petitioner could have requested that the court convert the special proceeding to an action (*see* CPLR 103 [c]; *Matter of Phalen v Theatrical Protective Union No. 1*, 22 NY3d 34, 41 [1968]) and moved for leave to amend the petition to include an express claim under section 1983 (*see* CPLR 3025; *Davis v S. Nassau Communities Hosp.*, 26 NY3d 563, 580 [2015] ["As a general rule, leave to amend a pleading should be freely granted in the absence of prejudice to the nonmoving party where the amendment is not patently lacking in merit"] [quotation marks and citation omitted]).

It is true that the federal government could withhold funds to enforce the reasonable promptness provision, but that is a severe penalty, one commonly included in many federal benefits statutes and not lightly imposed. Withholding of funds occurs after extensive investigation establishing violative conduct, and after the governmental recipient has refused warnings to comply. (*See generally* 42 USC § 1396c.) No such investigation has been announced here and no federal money has been withheld despite the years of complaints about the State's failure to properly serve people with disabilities. Further, as Justice Sotomayor explained in her dissent in *Armstrong*, withholding of federal Medicaid funds, which are intended to ensure the availability of services, is not always "a particularly effective means for redressing a State's violations," because reduction of federal funds "will often be self-defeating" (575 US at 342 [Sotomayor, J., dissenting]). As amici Former HHS Officials explained in *Armstrong*, a "state's non-compliance creates a damned-if-you-do, damned-if-you-don't scenario where the withholding of state funds will lead to depriving the poor of essential medical assistance" (*id.*, quoting Brief for Former HHS Officials as Amici Curiae at 18, available at 2014 WL 7366055).[11]

In any case, as the Supreme Court has stated, authorization of federal withholding of funds alone does not establish an intention against a private right of action (*see id.* at 329 ["The provision for the Secretary's enforcement by withholding funds might not, by

---

[11] Respondents also note that Congress has provided for fair hearings for individuals seeking to challenge certain determinations regarding their eligibility for Medicaid or changes to their services (*see* 42 CFR § 431.220 [a] [1]). But, as petitioner points out in response, delays in the provision of services that both the Medicaid recipient and the State agree are appropriate do not afford a basis for a fair hearing (*id.*)

itself, preclude the availability of equitable relief"]), and the provision here does not suffer from the additional problem of being unadministrable. Compared to the provision in *Armstrong*, which imposed requirements on state Medicaid plans that entailed significant discretion (*see id.* at 328 ["It is difficult to imagine a requirement broader and less specific than § 30 (A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard(ing) against unnecessary utilization of . . . care and services'"]), the provision at issue here—far from requiring "enforcement of [a] judgment-laden standard" (*id.*)—turns on a determination of a single criterion: the time it takes to provide services. As I have explained, courts are well positioned to render a determination on compliance with this requirement. Thus, the *Armstrong* analysis does not foreclose but rather supports a private right of action by implication for violations of the reasonable promptness provision.

VII.

Americans with Disabilities Act

Petitioner asserted two causes of action, alleging that respondents violated the ADA by failing to comply with its implementing regulations. Neither cause of action should have been dismissed at this stage of the litigation, as petitioner has alleged viable claims for relief.

A.

The Integration Mandate

Petitioner's sixth cause of action alleges that respondents violated the so-called integration mandate, which requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" (28 CFR 35.130 [d]). Respondents counter that the regulations prohibit denial of an existing service and do not demand the creation of a new service to allow integration of a disabled individual. According to respondents, because petitioner seeks delivery of services by state employees rather than private providers, she demands relief in contravention of the regulatory mandate, which does not require this type of alteration of the State's delivery model. The Appellate Division agreed.

Respondents' arguments, and the reasoning below, rest on a misunderstanding of petitioner's challenge to respondents' service delivery model, generally, and its cause of action based on the integration mandate, specifically, which charged respondents with violations based on the failure to deliver services that the State itself determined petitioner was entitled to receive. Respondents' only argument is that they did their best to try and secure those services, given the shortage of available providers in her region. Petitioner claims that the State cannot avoid its obligations under the law by shifting the blame to the lack of local providers. Regardless of whether petitioner ultimately prevails, she has certainly alleged a viable claim for relief, since it is for the courts to determine whether respondents' failure to address this gap in service violates the law invoked by petitioner.

In *Olmstead*, the Supreme Court deferred to the Department of Justice's long-established interpretation that unjustified, institutional isolation is discrimination based on

disability, in violation of the ADA (*see* 527 US at 599). This interpretation reflects an understanding that,

> "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment . . . Dissimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice" (*id.* at 600-601 [citation omitted]).

The Court went on to hold that Title II of the ADA requires that states "provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities" (*id.* at 607).[12]

More recently, in *Davis v Shah*, the Second Circuit applied the requirements of the integration mandate to prohibit different treatment of classes of Medicaid-eligible recipients. *Davis* was a challenge to New York State's choice to limit coverage for

---

[12] DOJ has concluded that the reasoning and holding in *Olmstead* applies equally to persons "at serious risk of institutionalization or segregation" (*Davis v Shah*, 821 F3d 231, 262 [2d Cir 2016], quoting US Dept of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*).

medically necessary orthopedic footwear and compression stockings, which minimized the risk of extended hospitalization or institutionalization, to patients with certain identified medical conditions (821 F3d at 264). The restricted coverage was a cost-cutting measure, which saved the State millions of dollars (*id.* at 241). The Second Circuit reasoned that even if it was the State's discretionary choice to cover these items, once the State chose to do so it was obligated "to provide those services in a nondiscriminatory manner under the ADA" (*id.* at 264). While a court's role is not to decide whether the service must be provided, a court must "determine whether New York discriminates on the basis of a . . . disability with regard to the benefits it does provide" (*Rodriguez v City of New York*, 197 F3d 611, 619 [2d Cir 1999]). The State's choice to cover some patients but not others was disability discrimination because the restriction was based on their medical condition (*Davis*, 821 F3d at 261-262).

*Olmstead* and *Davis* support petitioner's claim that she alleged a viable cause of action under the integration mandate. The petition alleges, and respondents do not dispute, that the State approved community habilitation and respite services for petitioner and that the point of contention is the unnecessary hospitalization pending delivery of those services. Indeed, the litigation was commenced to end petitioner's emergency room confinement and secure her discharge, precisely so that she could access those services. Petitioner sufficiently alleged that respondents violated the integration mandate by creating a model with a service delivery gap that results in the extended confinement of children, a gap not experienced by either adults with developmental disabilities or children who do

not have complex developmental disabilities. After falling into such a gap, developmentally disabled children fail to receive services "in the most integrated setting appropriate to their needs" (28 CFR 35.130 [d]).

Respondents argue that they complied with *Olmstead* and the integration mandate. Perhaps they have—although that is hard to square with respondents' concession that they did not provide the required services for at least a month, during which petitioner was confined in an emergency room, segregated from her community in exactly the way that the integration mandate seeks to avoid. In any case, whether respondents have complied cannot be decided without factual development. Respondents also argue that *Davis* is distinguishable because, there, the state was not required to create a benefit but merely to provide an existing benefit. Respondents' argument depends on the same mistaken assumption that, as a matter of law, petitioner seeks a new service. But petitioner asserts only that the State must provide her the community habilitation and respite services it has already approved and which are available and regularly provided to adults with developmental disabilities without the lengthy confinements in hospitals experienced by children on account of their complex developmental disabilities.

Respondents assert that petitioner demands more than the law requires because a state is not required to fundamentally alter its services and programs. It is true that, since *Olmstead*, federal courts have concluded that a state is not obligated "to create new services in order to enable an institutionalized individual to live in a more integrated setting" (*Radaszewski ex rel. Radaszewski v Maram*, 383 F3d 599, 609 [7th Cir 2004], citing

*Rodriguez*, 197 F3d at 615-616). However, these questions—whether the provision of community habilitation and respite services to petitioner and other children with developmental disabilities could not be provided through a reasonable accommodation, or if that would require a fundamental alteration of the State's service model—are not pure questions of law that can be decided against petitioner at this stage of the litigation, as respondents and the Appellate Division conclude.

First, the answer to that question requires a determination based on a factual record. For example, there has been no factual development to assess respondents' assertions that OPWDD worked diligently to facilitate petitioner's discharge and find her a temporary placement, and that it was thwarted in its efforts solely because there were no available providers. No party disputes the scarcity of provider resources for children with complex developmental disabilities in petitioner's region. Whether there was an available accommodation, however, is unknown.[13] It may be the case that an accommodation is available within the parameters of respondents' service model or without a fundamental alteration to its private provider model. However, that can only be determined after discovery on these issues.

---

[13] This is a particularly odd argument for the State to make given respondents' current claim that the newly expanded CSIDD program will avoid lengthy delays in service delivery in petitioner's region. The state cannot have it both ways, on the one hand arguing that, at the time petitioner was confined to an emergency room for over a month, it did all it could do under its private service model and then relying on expansion of the same basic model to argue lengthy unnecessary hospitalizations will not recur. It may be that the expanded CSIDD program is an accommodation that does exactly what the State claims, but that determination requires a record to support it.

Second, petitioner need not plead nor prove that the relief she seeks cannot be granted without a fundamental alteration to the State's services or programs. Respondents' assertion of a fundamental alteration is an affirmative defense that they must establish, and which should not serve as a basis for dismissal at the pleading stage (*see Olmstead*, 527 US at 607 [Stevens, J., concurring] ["If a plaintiff requests relief that requires modification of a State's services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs"]). As the Seventh Circuit held in *Radaszewski*, "so long as it is possible for the plaintiff to show that the services [they] seek[] to receive . . . are, in substance, already provided" in a comparable form, "the State is not entitled to judgment on the pleadings" based on this defense (383 F3d at 611; *see also J.D. ex rel. Doherty v Colonial Williamsburg Found.*, 925 F3d 663, 676 [4th Cir 2019] [noting that defendant bears the burden of establishing that a reasonable accommodation would require a fundamental alteration and, when there is a dispute of material facts as to this question, it must be resolved by the fact-finder]). Respondents did not carry this burden below, relying instead on its assertion that the pleading must be read as demanding but one remedy—that OPWDD employees provide the necessary services—which, according to respondents, constitutes a fundamental alteration of their service delivery model. That plainly misunderstands the nature of this litigation. There is no service delivery model to alter if there is no service actually provided. What petitioner alleged was that the State's efforts under its existing model failed to provide petitioner with the services the State had approved, without extensive delay and confinement, and which would have been available

to a developmentally disabled adult without such lengthy segregation and the harms that flow from it. The burden is on respondents to show that the only way to accommodate petitioner would fundamentally alter the State's service model. For her part, petitioner did all that is legally required of her at this stage of the litigation: she pleaded the failure to deliver services in a timely fashion, which resulted in her unnecessary and lengthy confinement in a hospital emergency room, a segregated environment at odds with the integration mandate. Thus, this cause of action should not have been dismissed.

B.

New York's Methods of Administration of its Medicaid Program

Petitioner's seventh cause of action asserts that respondents administer the Medicaid program in violation of the ADA. She invokes 28 CFR 35.130 (b) (3), which provides that a "public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration" that foster discrimination against individuals with disabilities. The Appellate Division concluded there was no improper administration of the Medicaid HCBS waiver program because petitioner's extended confinement was due to OPWDD's service model and the lack of local private providers, which petitioner did not allege was caused by discrimination (*see* 176 AD3d at 37).

The facts alleged by petitioner, and not disputed by respondents, are that respondents' service delivery model results in extended periods of confinement for children with complex developmental disabilities, during which they do not receive the Medicaid services to which they are entitled. Those services are necessary for their health and

wellbeing and are essential to ensuring their ability to live in the community rather than in institutional settings. Petitioner alleges that those services were not available to petitioner without extended delay because of the lack of private providers and that respondents failed to address this gap in service delivery administratively. Thus, the petition asserted that respondents' administration of the Medicaid program has the "effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities" (28 CFR 35.130 [b] [3] [ii]). The claim is based on disparate effect—which is prohibited under the regulation—not intentional discrimination, as the Appellate Division held. Therefore, the cause of action should not have been dismissed.

## VIII.

The Appellate Division should be reversed and the matter remitted to allow for consideration of petitioner's causes of action (with the exception of her third cause of action under the MHL) on a properly developed record. Contrary to the State's contention, it cannot avoid petitioner's claims that respondents have failed to comply with their obligations under state and federal law simply by categorizing those alleged failures as unreviewable "policy" choices. Respondents are plainly entitled to make policy decisions as to how to provide Medicaid services in New York, and some of those decisions may indeed be beyond a court's power to review. However, respondents cannot implement their policy choice—here, delivery of Medicaid services to children with complex developmental disabilities—by administering the program in such a way as to leave

significant gaps in service delivery, a gap that results in the very confinement that federal and state law is designed to replace with community-based services. That is all the more true when, according to petitioner, those gaps may be amenable to a resolution that would not otherwise disturb the State's general policy of providing these services. Put another way, respondents cannot assert that they made a decision that results in confinement of disabled children for extended periods of time—in violation of the service plan—and then shield that choice from judicial review of its legality. Respondents cannot ignore the allegations, nor the findings in the courts below, that their Medicaid program fails these children by arguing that the law puts no responsibility on their shoulders—as the ones who created and implement the program—to address those failures.

I dissent.

Appeal dismissed, without costs, upon the ground that the issues presented are moot, in a memorandum. Chief Judge DiFiore and Judges Garcia, Wilson, Singas, Cannataro and Troutman concur. Judge Rivera dissents in an opinion.

Decided April 21, 2022